[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 FACTS
This case involves a dispute between two adjoining landowners in the town of Orange. On December 21, 1994 Lorraine Hillgen, the plaintiff, purchased Lot 5 in a subdivision known as Englewood Estates in the town of Orange. On June 16, 1995 Mindy Printz-Kopelson, the defendant, purchased Lot 4 which is located in the same subdivision and adjoins the northern boundary of Lot 5. The deeds for both parcels were properly recorded on the land records. There are two sets of covenants controlling the lots within the Englewood development. This case is concerned with the second dated February 22, 1988 known as the "Declaration of Covenants, Reservations and Restrictions by Arnold Peck" and covers Lots 3, 4, 7, 9, and 11. This set of covenants was properly recorded on the land records. In March of 1987, the boundary of Lot 5 was changed by the owner at the time, Arnold Peck. Mr. Peck changed the boundary between Lot 5 and Lot 11, which he also owned and revised Lot 5's western boundary, such that Lot 5 was made larger and Lot 11 was made smaller. CT Page 6121
The dispute between the parties arose on June 28, 1995 when the defendant notified the plaintiff that she was going to have an in-ground swimming pool installed on her property the next day. That evening the plaintiff, after consulting with her husband, expressed her extreme displeasure over the placement of the swimming pool and pool filter so close to the boundary line. The defendant, after explaining to the plaintiff that the location selected was the only one possible for her lot, continued with the planned installation of the pool. A few days later, in early July, the defendant expressed her concern to the plaintiff over the placement of some arborvitae bushes which the plaintiff had planted in May along the boundary between Lot 5 and 4. The defendant believed the bushes were planted partially on her property. In response the plaintiff instructed her landscaper, David Schmidke, to relocate the bushes to the proper boundary line. After the relocation the defendant continued to believe that the bushes were still partially on her property.
The next skirmish between the parties involved the defendant's plan to erect a fence on her property parallel to the plaintiff's arborvitae bushes. The fence was erected in mid July and immediately the parties were in dispute over what impact the fence might have on the bushes. The plaintiff was concerned about the appearance of the fence, the potential harm caused by staining the fence, and the possible impairment of light and moisture needed by the arborvitae bushes. In late July 1995, the plaintiff directed Mr. Schmidke to place cow manure as fertilizer along the boundary line for the benefit of the arborvitae bushes. The parties are in dispute over the amount of manure placed over the area. After the fertilizer was in place, the plaintiff regularly watered the bushes. Shortly after the arrival of the fertilizer the defendant became upset with what she believed was manure being washed under her fence and into her pool by the watering of the bushes. In response to the flow of water and fertilizer, the defendant hired a landscaper to construct a railroad tie barrier on her property that would block the run off from the plaintiffs property.
In October 1995 the defendant had her fence stained and the plaintiff contends that the staining harmed her bushes causing several of them to be replaced. Additionally the plaintiff complains that during the excavation of the pool a quantity of soil and rocks spilled over onto her property.
 STATEMENT OF THE CASE
The complaint is in seven counts, with the first three counts claiming the fence and pool violate the Zoning Regulations of the Town of Orange CT Page 6122 and certain deed restrictions affecting the parties' parcels. Count four alleges the defendant has erected a "spite fence." The fifth count addresses an alleged trespass onto the plaintiffs property "by depositing earth material which resulted in pollution." The sixth and seventh counts deal with the plaintiffs planting of a row of arborvitae along the same boundary line and the defendant allegedly damaging the same.
The plaintiff seeks injunctive relief from the zoning and restrictive covenant violations, and money damages for the damage to the arborvitae and counsel fees.
The defendant has filed a counter-claim, seeking to recover the cost of the retaining wall, also erected along a portion of the boundary line because of manure and other debris being deposited onto the defendant's property and into the pool.
At the conclusion of the evidence, at the request of counsel, the court made a site visit accompanied by counsel and its temporary assistant clerk, Thomas Byrne, Esq. The plaintiff was at the scene and participated to the extent of answering questions and commenting.
 DISCUSSION I
The site visit performed in this case proved helpful in evaluating the claims and the physical evidence. This was especially true with respect to the fifth count.
A witness for the plaintiff identified a small area of the plaintiffs property, near the boundary line, where, in the course of excavating for the pool, some rock and shale had been dislodged over the boundary line.
The defendant testified that upon learning of this she had her landscaper re-grade, spread soil and seed the area.
When the court visited the site, no area such as that complained of could be seen. Neither the plaintiff nor her counsel could point out such an area. The section of the property where this "trespass" occurred is on a fairly deep slope, only roughly improved, and not within easy view of either residence. The plaintiffs surveyor testified that "no yard was maintained" in the area.
The defendant's curative measure appears to have eliminated the condition, one which can be classified as "de minimis" to start with. There is no sign of pollution and the plaintiff has offered no evidence CT Page 6123 to support the allegation.
When pressed to estimate the cost of removing the dislodged rock and shale, the plaintiffs gardener estimated the cost to bring a truck to the site and remove it would be $100. The defendant's landscape appears to have corrected the dislodgment.
The fifth count is dismissed.
 II
Counts six and seven involve the arborvitae the plaintiff planted on or near the boundary line. It is the plaintiff's claim in count six that the defendant damaged the trees planted along the boundary line "in violation of her obligation to maintain a divisional fence pursuant to Connecticut Statute 47-43." The seventh count seeks treble damages pursuant to Section 52-560.
A. There are several weaknesses to the plaintiffs theories, not the least of which is that a row of trees is not listed as a proper type of divisional fence in Section 47-43. Another problem is that even if these were to constitute the "hedge fence" permitted by Section 47-43, the plaintiffs "fence" was not a "divisional fence" as contemplated by the statute because it only ran a short distance along part of the boundary line.
Finally, even if this partial fence of trees were to be considered a divisional fence, the plaintiff neglected to take the statutory steps required to have it declared a divisional fence.
Consequently, Section 47-43 imposed no obligation on the defendant to maintain these trees and judgment must enter for the defendant on the sixth count.
B. Treating the seventh count solely as a claim for treble damages to the trees owned by the plaintiff, it was the plaintiff's obligation to prove the damage was caused by the defendant and then to prove the monetary value of the damage caused.
As originally planted, the line of arborvitae was not planted on the property line as 5 or 6 plants were placed on property of the defendant. (Testimony of Mr. Fisher, the plaintiffs surveyor). They were transplanted by the plaintiffs gardener, Mr. Schmidtke. Though the defendant did not then and has not pleaded as to it, that did constitute a trespass and it occurred in an area where a yard was maintained. CT Page 6124
Mr. Schmidtke testified that he saw damage to these trees which he concluded was due to over-spraying when the defendant had the fence installed on her property. He believed he replaced 7 trees in October 1995. He also felt that the concrete poured by the defendant's fence contractor for the fence posts could have been a factor. However, he also stated that these trees need full sun to thrive and at this location, they should survive but won't thrive because of a lack of sun. He estimated the cost of a total replacement to be $3900.
The defendant offered the testimony of Edgar Vaughn, a landscape architect with an impressive background in the area of plant husbandry and forestry. He is presently the tree warden for the Town of Orange. Mr. Vaughn visited the premises on July 17, 1995 and took photos, showing the line of trees with the dead ones visible. However, the fence is no where in sight, indicating no over-spray from the fence killed the trees as the fence had not yet been erected.
It was Mr. Vaughn's opinion that these trees died from a lack of moisture — i.e., insufficient watering. He found no evidence of damage from a spray, as that type of damage would show as a pattern on the entire tree. He rejected the concrete post holes as a cause because the post hole pattern is inconsistent with placement of the tree root balls and the root balls would not have been in touch with the post holes. Rocky soil conditions could also have been the cause of the poor condition as well as the piling of a foot of manure on the fresh root areas. Mr. Schmidtke indicated he had followed that procedure.
On this evidence, the court cannot find that the defendant was responsible for the alleged injury to these arborvitae.
Further, even if liability were found on the part of the defendant, the plaintiff has not shown any out-of-pocket loss. The trees Mr. Schmidtke replaced for "spray damage" were covered by a warranty of the seller and were replaced at no cost. As the present line of trees exists, with the trees Mr. Schmidtke removed replaced by new ones, there is no evidence of any present existing damage and nothing about their present condition attributable to the defendant.
In its visit, the court observed these controversial items. They are not thriving, nor does it appear that they are receiving any individual care and attention such as pruning, weeding, mulching, etc.
Judgment may enter for the defendant on the seventh count.
 III CT Page 6125
The plaintiffs fourth count is directed at the fence erected by the plaintiff, claiming that the "unsightly or interior side" faces the plaintiffs property. It is further alleged that the fence was erected with malice and with the intent to harass the plaintiff and to injure the plaintiffs enjoyment of her property, resulting in an impairment of the value of the property while surveying no useful purpose to the defendant.
The fence in question is of stained wood with inset panels framed between posts. It is sturdy, well constructed and professionally installed. The plaintiffs house, according to her counsel, is 135 feet away.
Connecticut General Statutes § 52-480 and 52-570 afford injunctive relief and damages for the erection of any structure "intended to annoy and injure" any owner of adjacent land "in respect to his use or disposition of the same." A fence is a structure within the meaning of these statutes. DeCicco v. Beach, 174 Conn. 29 (1977). This case and Whitlock v. Uhle, 75 Conn. 423 (1903) have addressed the required elements of a cause of action under these statutes.
The fence complained of was built by the defendant to surround an in-ground pool she had installed. While affording an element of privacy to that use of her premises, it serves as a safety measure and satisfied the town building requirement that in-ground pools be fenced.
These facts alone render the statutes inapplicable to this situation. The Whitlock v. Uhle case stands for the proposition that if the structure complained of involves a substantial benefit to the owner, the statutes do not apply. Id. at 427.
There was no evidence adduced at trial, and plaintiffs counsel in argument offered no suggestion to support the claims that this fence was erected with malice, with intent to harass the plaintiff, that it affected the value of her property and reduced her enjoyment of her property.
As the court noted above, the plaintiffs house is 135 feet away from the fence and its front windows don't look out at it. The portion of the plaintiffs property closest to the fence is a portion of the driveway.
The harshest criticism the court heard about this fence is that "the unsightly side faces the plaintiff's property." The court would be hard pressed to label that side of the fence "unsightly." It is the side showing the supporting posts, but it is finished, stained, and the panels neatly secured in place between the posts. Actually, the support members CT Page 6126 face the defendant's property in another area of the yard.
The court does not find the fence unsightly, and notes the appearance of the boundary line between these properties would be enhanced if the plaintiff removed the row of arborvitae and permitted the defendant to landscape along the base of the fence.
In the course of closing arguments, counsel for the plaintiff made the claim that this fence should be an "open fence, "pursuant to the deed restrictions the plaintiff is seeking to enforce in this action. He suggested that an "open fence" would be preferable for safety reasons — his clients could see through the "open fence" and be sure the defendant's children were not in any danger in the pool.
While this court doubts this reflects a change in attitude toward the defendant by the plaintiff, an "open fence" around this pool would be a safety hazard, an attractive nuisance, and a violation of the rules pertaining to swimming pools.
The plaintiff having failed to show this was erected as a "spite fence" and not having proved the allegations of this count, judgment may enter for the defendant on the fourth count.
 IV
The court will lastly address the plaintiff's claims contained in the first three counts with respect to restrictive covenants she seeks to enforce and alleged zoning violations. Because of the emotional undertones to this litigation and to seek a degree of finality to this dispute, the court will address the question of whether there are violations of the covenants, as well as the question of whether the plaintiff is entitled to enforce the terms of the covenants in question.
A. Prior to February 22, 1988, Arnold Peck was the owner of lots 3, 4, 5, 7, 9 and 11 in the "Englewood Estates" subdivision in the town of Orange. In 1987, a lot line revision was effected, by which a portion of lot 11 was added to lot 5. Plaintiffs Exhibit F shows lots 5 and 11 as of October 1, 1983. Plaintiffs Exhibits G shows the inlayed boundaries of lot 5 and a somewhat reduced lot 11. As of this map, March 30, 1987, the lots are depicted separately as lots 5 and 11. The revision was effected by re-drawing maps and without the recording of any documents.
The new enlarged lot 5, apparently intended by Peck to be retained for himself, was not included in the "Declaration of covenants, reservations and restrictions by Arnold Peck," dated February 22, 1988 (Exhibit D). Relating that he "intends to sell said building lots #3, 4, 7, 9, 11 for CT Page 6127 dwelling units and to sell same subject to the covenants, reservation, restriction and charge hereinafter set forth . . ." Peck goes on to declare said lots are and shall be held subject to the same. There is no inclusion of lot 5 and by the above and additional language, it is clear that it was Peck's intention to exclude lot 5 from the operation of Exhibit D. The document clearly intended to impose the restrictions on the listed lots and exclude lot 5 as it then existed.
While the language of this instrument is clear, our Appellate Court has discussed how to interpret covenants such as these:
 "The meaning and effect of the [restrictive covenant is] to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances. . . . The primary rule of interpretation of such [restrictive] covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met."
Wood v. Amer, 54 Conn. App. 601, 605 (1999).
Having taken the steps to exclude his retained lot 5 from inclusion under these covenants, it is somewhat far fetched to suggest that Peck intended to have them re-appear via the revised boundary lines effecting lots 5 and 11.
From this analysis, the court concludes that the covenants in question do not cover lot 5 despite its absorption of a portion of lot 11 and the plaintiff does not have standing to enforce these covenants against the defendant, the owner of lot 4.
B. There is yet another strong legal agreement against adopting the plaintiffs proposition that lot 5 "acquired" the encumbrances in the form of these deed restrictions from its absorption of a portion of lot 11.
Connecticut has been and remains a "recording state" with respect to real property transactions. As such, we rely on one's chain of title for notice of title defects, encumbrances, etc.
Purchasers of lots 3, 4, 7, 9 and 11 would have been on notice, after February 22, 1988, that their parcels were subject to the Peck CT Page 6128 covenants, restriction, etc. Thus, they alone could enforce the terms and the terms could only be enforced against any one of them by the others in this group.
However, they would be unaware of the likelihood that the owner of lot 5 had a "wild card" option to attempt to impose any of the recorded covenants on them. Similarly, they had no reason to believe that any of them could impose these conditions on lot 5.
In this case, the revision of the boundary line between lots 5 and 11, effected by the owner of all of the lots (Exhibit F G), did not cause notice to the owners of lots 3, 4, 7, 9, and 11 of anything affecting their chain of title except for a charge of boundary for lot 11.
With the recording of the Peck covenants (Exhibit D), the lot owners received notice of the covenants as to their lots, excluding lot 5.
Thus, aside from the discussion and conclusions reached in Section IV(A) above, the plaintiff has this insurmountable notice hurdle to overcome in attempting to enforce the covenants.
The principle here has been enunciated in Kulmacz v. Milas, 108 Conn. 538
(1928). In a discussion commencing at page 541, the Supreme Court addressed a situation where a map was not likely to come to the attention of searchers. The court concluded: "and, finally, one searching title to land is not bound to search the record at large, but only is bound with such facts as appear in the chain of title to the particular lots in question . . . citing Wheeler v. Young, 76 Conn. 44, 51 (1903).
C. Even if the restrictive covenants were to apply to lot 5, thus giving the plaintiff standing to enforce them, the defendant is not in violation of them.
1. The plaintiff alleges that the fence in question violates covenant d which reads in part, "No fences shall be erected in front of the building set back line." The Orange zoning regulations set forth the set back requirements and for our purposes the front yard set back of 50 feet is pertinent. The town zoning enforcement officer testified that the fence did not violate the set back regulation. In fact, Mr. Fisher, the plaintiffs surveyor, testified that the defendant's home was 52 feet from the street line and the fence is an extension of the line on which the house is placed. Mr. Fisher's testimony was that the fence was in violation because it was 35.3 feet from the street line of the cul-de-sac in front of the plaintiffs property. This overlooks the fact that the 50 foot set back line is the defendant's front set back line and is measured along its frontage with respect to the street line. And, the covenant CT Page 6129 refers to a single set back line, so that has to be the line we must scrutinize. Employing Mr. Fisher's method of measuring to the street line in front of the plaintiffs property is not appropriate, as the zoning officer's opinion would indicate.
If the plaintiff's argument is that the "building set back line" includes all set back lines, then the applicable set back line from the cul-de-sac bordering the plaintiffs property would be the side yard set back line. The zoning code indicates that set back is 25 feet — well within the 35.3 feet measured by Mr. Fisher.
2. The plaintiffs attempts to enforce another of the covenants appears to be capricious at best. When the defendant advised the plaintiff she would be installing a pool, she responded by installing a row of tall arbor vitae, planted fairly close together. This was apparently an attempt to screen a view of the pool from the plaintiffs house. Now, she seeks to have the defendant remove the solid fence which screens the pool from her view and replace it with an "open fence."
The covenant in question is as follows:
 No swimming pool shall be erected or maintained in or upon any lot nearer to any street line than the rear corner of the dwelling house facing said street-line. Any such swimming pool shall be enclosed with an open fence.
 A.
The court finds this covenant troublesome because there is no explanation of its purpose and the town's building regulations[1]
require a pool to be enclosed by a fence which addresses safety concerns — a closed fence. Obviously, the open fence was originally specified for aesthetic reasons. But, under present conditions, the covenant required open fence would have to be supplemented by a closed fence. This would result in some unsightly alignments — especially here where the required fence is so close to the edge of the pool.
With a closed fence required by the town, the plaintiff would force a property owner to build a fence within a fence to serve no purpose, and actually to defeat the purpose of the original covenant declarant.
 B.
The plaintiff posits in her brief that when a restrictive covenant is more restrictive than a municipal zoning ordinance, the covenant CT Page 6130 prevails. (Citation omitted, Page 5).
In this case, the town building regulation is more restrictive than the covenant, but in any event because of the serious safety concerns encompassed in the regulation, the covenant must yield to the town's exercise of its police power.
Adopting the plaintiffs reasoning would require all pools to be double fenced, and in those cases where a property owner chose to fence the entire yard for pool safety, an open face serving no purpose would also have to be built surrounding the pool itself.
The absence of other requirements accompanying the implementations of this covenant suggests to the court that when Mr. Peck declared these covenants in 1988, the developer, was more concerned about the aesthetics of his project than safety issues which may not have been so prominent then.
It is the conclusion of the court that the defendant is not violating the open fence covenant because it cannot supercede the more restrictive town regulation and the safety requirements of the town are obligatory.
Further, to pay lip service to the sparse language of this covenant would involve ignoring the concerns of the declarant as he then perceived the area and enforcing an outdated pronouncement to produce an outrageous result. On this point, the court relies on the language cited above fromWood v. Amer.
The court finds no violations have occurred, but if they have, the violation is of a term or condition which should not be enforced because it is vague, out of date and of without logical purpose.
In summary then, judgment may enter for the defendant on the first three counts of the complaint:
As to the alleged zoning violations, the testimony of the Orange zoning officer was that neither the fence nor the pool filter were zoning violations (counts one and three);
Wooden fences are permitted between boundaries by "d" of the Peck covenants (counts one and three);
The "open fence" covenant "f" (count two) is inapplicable as discussed above.
 V CT Page 6131
The defendant has counterclaimed and seeks to recover for the costs of landscaping and erecting a timber retaining wall along the boundary line and inside the fence discussed above.
It was her testimony that this step was necessitated by the actions of the plaintiff in washing pebbles, manure from the arbor vitae bed, and other debris into the pool while ostensibly watering the arbor vitae.
The court believes the defendant and feels she acted reasonably under the circumstances. The one element lacking on this claim is evidence to justify this expenditure as a reasonably necessary solution.
 CONCLUSION
Judgment may enter for the defendant on all seven counts of the complaint and for the plaintiff on the remaining count of the defendant's counterclaim.
Anthony V. DeMayo, Judge Trial Referee